# NOVEMBER, 1916

### C. E. GILMORE V. PAUL WAPLES ET AL.

#### No. 2895.   Decided November 4, 1916.

1.—Primary Election—Party Executive Committee—Nominations—Injunction.

The action of the executive committee of a party in placing on the official ballot as party nominee the name of a candidate where no nomination for such

office was made at the primary election, would not be an invasion of the legal rights of one who was a member of the party and announced candidate for the office unless there was a law prohibiting such action by the committee; but if such action be forbidden by statute, and would inflict on complainant, as candidate for the office, material injury for whicn he had no adequate legal redress, the committee could be restrained by injunction from so acting.     (P. 170.)

### 2.—Same—Statute Construed.

By articles 3172, 3173, Revised Statutes (Primary Election Law), the executive committee of a party have the right to place on the official ballot, as party nominee, a name of their own selection, where the candidate chosen at the primary election dies or declines the nomination before the general election; but except in such case they are directly forbidden by the statute from so doing. (Pp. 170, 171.)

### 3.—Same—Statutory Construction—Omission.

The language of article 3173, Revised Statutes: "No executive committee shall ever have any power of nomination, except where a nominee has died or declined the nomination as provided in article 3172," is plain, and leaves nothing for interpretation or construction; and the courts are without power to set it aside or to prescribe means for supplying an omission in its provisions, especially a means which the statute expressly forbids.     (P. 171.)

### 4.—Same—Case Stated—Judicial and Political Questions.

A primary election was held to select candidates for the Democratic party. Thereafter, and before the general election, a vacancy was created in the office of Railroad Commissioner by the death of a member whose term of office did not expire until two years later, and for whose position, no vacancy being anticipated, no nomination had been made at the primary election. The Democratic Executive Committee of the State selected a candidate and were about to place his name on the official ballot as Democratic nominee for that office. Plaintiff, a Democrat, who had meantime announced himself as a candidate for the office sought to enjoin this action by the committee as prejudicial to his right to contend for such office as a Democrat. Construing articles 3172, 3173, Rev. Stats., the Primary Election Law, it is held:

1. The purpose of all rules of construction is simply to ascertain the legislative intent; but this intent must be consistent with the words of the statute itself. There can be no intent in a statute not found in its words, and certainly there can be none that is expressly negatived by its words.     (P. 172.)

2. The grant of the power to the committee to act in a particular instance and the omission to provide any method for nomination in another possible case of vacancy can not imply a power in it to so act in the teeth of a plain negation of that power by the statute except in the particular instance in which it was authorized.     (Pp. 171, 172.)

3. The Legislature having authority to provide reasonable methods for making party nominations, but not to absolutely prohibit any nomination being made, their failure to provide method for a nomination in a particular case left the selection of a nominee open to any method agreeable to party usage and not expressly forbidden by law, but not to a method so forbidden.     (Pp. 173, 174.)

4. The Legislature having undertaken by statute to regulate the matter of party nominations, the enforcement of such statute involves a judicial question which is to be dealt with by the courts as the only means of giving the law effect, and not merely a political one under the uncontrolled management of party machinery.     (Pp. 174-181.)

5. The candidacy of the plaintiff having the protection of the statutes which declares the proposed nomination unlawful, his right to be unopposed by an unlawful nomination is a legal one, in which he is entitled to demand protection.     (P. 178.)

6. The proposed action of the committee threatened a material injury to plaintiff, for the redress of which no adequate legal remedy existed, entitling him to equitable relief.     (P. 178.)

7. In a concurring opinion, Mr. Justice Hawkins suggests that article 2966, Revised Statutes, prohibiting the placing on the official ballot of any names not nominated at the primary election, is inapplicable as applied to the case at issue, because it was not within the power of the Legislature to prohibit party nominations entirely, nor to prescribe impossible conditions therefor; and that in this case it was still possible to resort to methods of nominations in accordance with usage, and not prohibited, as was nomination by the executive committee, by express terms of the statute. (Pp. 182-185.)

DISSENTING OPINION.

**5.—Same.**

Mr. Justice Yantis, dissenting, is of the opinion:

1. That the action of the executive committee in selecting and placing on the official ballot the name of a candidate, where action by primary election was impossible, was warranted by the intent discoverable from the terms of the Act generally. (Pp. 185-192.)

2. And that the wrong complained of was an invasion of the political, not of the civil rights of plaintiff, in which it was beyond the power of a court of equity to interfere. (Pp. 192-209.)

Error to the Court of Civil Appeals for the Third District, in an appeal from Tarrant County.

The action was for injunction, which was granted by the trial court. Defendants appealed and the judgment was reversed and injunction dissolved, whereupon plaintiff obtained writ of error from the Supreme Court.

*Wynne & Wynne* and *Lattimore, Bouldin & Lattimore,* for plaintiff in error.

*Capps, Cantey, Hanger & Short, David B. Trammell, J. W. Odell,* and *W. P. McLean, Jr.,* for defendants in error.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

The action was one by C. E. Gilmore, alleging himself to be a Democrat, regularly affiliated with that party, and an announced candidate in the ensuing general election for the office of State Railroad Commissioner, against Hon. Paul Waples as chairman and the other members of the State Democratic executive committee to restrain them from making a nomination for the same office. The petition declared it to be the purpose of the committee, unless restrained, to make such a nomination and to declare Mr. C. H. Hurdleston the nominee of the Democratic party for the office, in contravention, it was claimed, of the statutes of the State denying any such authority to the committee.

The basis of the suit is the right of the plaintiff, as he contends, to contest for the office as a Democrat in the general election without being subjected to the disadvantage of being opposed by a Democratic nominee whose nomination is prohibited by law.

It is recited in an agreed statement of facts, a part of the record, that Mr. Williams, the former incumbent of the office, was not at the time of his recent death a nominee of the Democratic party for the

office, having been duly elected to it in the year 1912 for a term extending until the year 1918; and that the salary of the office is $4000 per year. Also, that the plaintiff is a Democrat and has always been affiliated with the party organiation. And further, that the placing of the name of Mr. Hurdleston on the official ballot in the general election as the nominee of the Democratic party will be equivalent to his election; and will preclude the plaintiff from being a candidate for the office as a Democrat, since he would withdraw his candidacy rather than assume the attitude of opposing one declared to be the nominee of the party.

An injunction restraining the committee from making any nomination for the office was issued by the District Court. This order was reversed and the injunction dissolved by the honorable Court of Civil Appeals, Associate Justice Buck, dissenting.

The case presents two questions for decision, one as to the power of the committee to make a nomination under the existing condition, and the other as to the right of the plaintiff to invoke the equitable remedy of injunction.

The determination of the latter question depends upon the decision of the first.

If there is no provision of law interdicting the proposed action of the committee, no legal right of the plaintiff can be said to be threatened with impairment, and the case presents merely a party dispute which the courts will remit to the party forum. On the other hand, if the proposed action of the committee is prohibited by law, a judicial question is presented; and if such action threatens a legal right of the plaintiff and the infliction upon him of a material injury for the redress of which no adequate legal remedy exists, his right to equitable relief can not be denied.

An inspection of the statutes makes it manifest that the Legislature has omitted to provide any method for the making of a party nomination for an office to be filled at the general election where the vacancy in the office occurs between the dates fixed by law for the holding of the general primary election and the ensuing general election, and for which office there has been no previous nomination of a candidate to be voted upon in the general election,—the condition which the case discloses. Other than the provision for an original nomination in the general primary election, nowhere is there provided any method for the nomination of a party candidate for a State office to be voted upon in the general election except where there has been a previous nomination and a vacancy in the nomination, caused either by a declination of the nomination or the death of the nominee. Mr. Williams, the former incumbent of the office in question, was not a nominee at the time of his death, which occurred after the time fixed by law for the general primary election. There was consequently no vacancy in a nomination. There was simply a vacancy in the office, calling for an original nomi-

nation if the party proposed nominating a candidate for the office in the general election.

Under this condition was the State Democratic executive committee prohibited by law from making a nomination? The powers of a State executive committee in respect to making nominations for its party are dealt with in articles 3172 and 3173 of the Revised Statutes. It is provided in article 3172 that in case of the death of a nominee for a State office, or the declination of such a nomination by a nominee, the State executive committee of the party may nominate a candidate to supply the vacancy. The succeeding article, article 3173, declares:

"No executive committee shall ever have any power of nomination, except where a nominee has died or declined the nomination as provided in article 3172."

There is nothing ambiguous about these two articles. Nor is their intention in anywise obscure. They very plainly confer upon a State committee the power of nominating a candidate for a State office in instances where there has been a previous nomination and the nominee has either declined the nomination or has died. Just as unequivocally they deny such power to the committee in all other instances. The language of article 3173 is pointed, clear and certain, and there is nothing about it or its context that would warrant a court in setting it aside. A statute so plain and unmistakable leaves nothing for interpretation or construction. All that courts may do with such a statute is to observe it and enforce it. There is an omission in the law, it is true. But it is not the business of courts to supply omissions in laws. Particularly are they without any authority to supply an omission in a law by holding that a certain body is empowered to do a certain thing when the Legislature has emphatically declared that such body shall not have the power to do that thing. To say that the Legislature's failure to prescribe any method for the making of a party nomination under the conditions here shown warrants a holding that an executive committee may nominate under such conditions, means only that the courts may themselves provide the method, and, in this case, a method the use of which for the purpose the Legislature has expressly forbidden.

It has been argued in behalf of the committee that the whole law discloses an intention on the part of the Legislature not to prohibit the committee's acting in such a contingency as the case presents, and that article 3173 should be so construed notwithstanding its literal terms. The intention of a law is the essence of the law, and from this it follows that the primary rule of construction is to ascertain and give effect to that intention. While the purpose of all rules upon the subject is simply to ascertain the legislative intent, and the context of a statute will be consulted in that effort, yet, in the language of a distinguished author on statutory construction, "the intent which is finally arrived at must be an intent consistent with, and fairly expressed by, the words of the statute themselves." Sutherland on Stat. Con., sec. 388.

There can be no intent of a statute not to be found in its words, and certainly there can be none that is expressly negatived by its words.

The argument that the Legislature did not intend in the enactment of article 3173 to prohibit a nomination by an executive committee under the contingency here involved, rests alone upon the grant of such power to the committee, in the case of the declination of a nomination or the death of a nominee, as provided in article 3172, and the omission to provide any method whatever for the making of a nomination under such other condition. But the grant of such power to the committee in a particular instance can not imply an intention to allow its exercise in another in the face of a positive statute that except in the instance particularized the committee shall not possess the power. · The only intention deducible from such a statute and consistent with its terms is a denial to the committee of the power except as expressly granted. Nor is an intention that the committee should have the power in an instance like that here presented supplied by the omission of the Legislature to provide any method for a nomination under such a condition, in the teeth of the plain negation of that intention found in the declaration of article 3173, that except in the case of a nominee's death or the declination of a nomination no committee should ever have the power of nomination.

There is but one intention to be drawn from this statute or its context that is consistent with the provisions of the statute. It is the intention which lies on the face of the words themselves,—that except in the case of the declination of a nomination or the death of a nomiuee, no committee shall have any power of nomination. As is said by the author above quoted:

"Courts· are not at liberty to speculate upon the intentions of the Legislature where the words are clear, and to construe an Act upon their own notions of what ought to have been enacted. The wisdom of a statute is not a judicial question; nor can courts correct what they may deem excesses or omissions in legislation, or relieve against the occasionally harsh operation of statutory provisions without danger of doing more mischief than good." Idem, sec. 364.

At another place in the same work, section 366, it is said:

"We are not at liberty to imagine an intent and bind the letter of the Act to that intent; much less can we indulge in the license of striking out and inserting, and remodeling with the view of making the letter express an intent which the statute in its native form does not evidence."

Further in the same section it is said:

"The courts have no function of legislation, and simply seek to ascertain the will of the legislator. It is true there are cases in which the letter of the statute is not deemed controlling, but the cases are few and exceptional, and only arise where there are cogent reasons for believing that the letter does not fully and accurately disclose the intent. *No mere omission, no mere failure to provide for contingencies, which*

*it may seem wise to have specifically provided for, justify any judicial
addition to the language of the statute."*

There are instances where the literal meaning of a statute may be
disregarded. But it is only where it is perfectly plain that the literal
sense works an absurdity or manifest injustice. Idem, sec. 408. Ed-
wards v. Morton, 92 Texas, 152, 46 S. W., 792, presented a case of
that kind. A literal construction of the statute there in question would
have entailed a holding that one recovering a judgment in the Justice
Court is required to give bond in double the amount of the judgment
in order to appeal. It would be a plain absurdity to require a man to
give a bond to secure a debt due himself and to one from whom the
debt was due; and this court accordingly refused to give the statute
that construction. But it can not be contended that the effect of a
statute which prohibits an executive committee of a political party from
making a nomination except as provided in article 3172 involves either
an absurdity or a manifest injustice. Vested as it was with the power
of legislation upon the subject, it was clearly competent for the Legis-
lature to provide for nominations by the committee in certain instances
and to deny it such authority in all others.

It is the undoubted right of a political party to make nominations
for the elective officers of the people. The Legislature has the authority
to prescribe reasonable methods to be employed for the purpose; but it
does not possess the power to absolutely prohibit any nomination being
made. Such an attempt would constitute an arbitrary interference with
the liberty of the people to freely associate themselves for the purpose
of expressing such choice for their elective offices as they might select
and for reasons they might see fit. "The liberty of the electors in the
exercise of the right vested in them by the Constitution to choose public
officers on whatever principle, or dictated by whatever motive they see
fit, unless those motives contravene common morality, and are, there-
fore, criminal, can not be denied. It seems to me as absolute as the
right to pursue any trade or calling, and, therefore, their right to asso-
ciate and organize for that purpose is equally great." Coffey v. Demo-
cratic General Committee, 164 N. Y., 335, 58 N. E., 124, 51 L. R. A.,
680. The failure of the Legislature to provide any method for a
nomination under the conditions created by the death of Mr. Williams
does not mean that the Democratic party was without any authority to
make a nomination for the office of Railroad Commissioner. In our
opinion it has that authority. The mere failure of the Legislature to
provide an available method does not defeat its right to make a nomi-
nation. The right exists and in our opinion might be exercised in any
manner agreeable to party usage not expressly forbidden by law. The
use of the executive committee as a method is expressly so forbidden,
in our view, by article 3173, and it can not, therefore, be availed of.
But except as the executive committee is denied any power of nomina-
tion under the conditions presented, plainly the making of a nomination
under such conditions is unregulated by any statute law, and it could,

therefore, in our opinion, be made in accordance with the party law and agreeably to party usage.

This brings us to the question of the right of the plaintiff to equitable relief.

The contention of the committee upon this phase of the case is that there is presented but a political question and at most but a political right, and for the protection of such a right equity will not extend its aid. This would be true as to the character of question and right involved, but for the fact that the making of party nominations in this State is regulated by law. With our legislation covering the subject, whether a given nomination has been made in accordance with that legislation or in violation of it, presents, not a political question, but, necessarily, a judicial question. For what purpose and to what end, it may appropriately be inquired, have the various statutes in relation to party nominations been enacted in this State if the rights and duties therein defined and the matters they purport to govern still present mere political questions, to be settled alone by party law and in the party forum, and are, therefore, beyond the cognizance of the courts? The very purpose of this legislation was to relieve these matters of their mere political character, as was their nature aforetime, and subject them to the regulation of the statute law. The courts exist only to enforce the law. This includes the statute law. If they have no cognizance of rights arising under a civil statute regulating a political party, upon the ground that the body regulated is political, and, therefore, any question affecting it is also political, though in terms governed by an express statute, it must follow that a political party is beyond the control of the law. But political parties are not beyond the control of the law. When regulated by law, their action to the extent that it is so governed may be reviewed by the courts as the only means of giving effect to the sovereign law of the State. In such case the inquiry is judicial because made the duty of the courts; and the questions presented are likewise judicial because arising under the written law.

Is the right of the plaintiff to contest for the office in the general election as a Democrat, without the disadvantage of an opposing Democratic nomination, a mere political right, where such nomination is made contrary to law? His right would be political, clearly, if the law did not make the opposing nomination unlawful. Does it remain, however, only a political right, under the law which forbids the nomination in the manner made? This depends simply upon whether the candidacy of the plaintiff for the office has the protection of the law which declares as unlawful the proposed nomination. If so, his right to be unopposed by the unlawful nomination is clearly a legal right. It could not be of a different character. A statute designed to protect a certain class of persons, and which in terms does so, against certain illegal action, by prohibiting such action, is a dead letter if it does not confer upon such persons a legal right to demand the protection.

Article 3173 was designed for the protection of political parties, and

every member of such parties acting within his lawful rights, against the use of unauthorized authority, by an executive committee. There can be no doubt, for illustration, that a candidate for a party nomination in the general primary election is protected by this statute in his right to have such primary election, alone, determine his candidacy. Nor can there be any question that such right would be a legal right. The statute making unlawful a nomination by the committee in such case necessarily confers upon a member of the party whose candidacy is lawful the legal right to be unopposed by such illegal action of the committee. Otherwise, the statute is of no force and protects nobody against usurpation of authority by an executive committee. Likewise, this statute would protect the candidacy in the general election of a member of the party who had been duly nominated in the general primary election.

The case presents a condition where it is plainly optional with the Democratic party of the State whether it makes any nomination for the office in question. Under the conditions presented,—the law having prescribed no method available for the purpose,—it is not required to make a nomination; and it has not made a lawful nomination.

That a member of the party, where no nomination is required to be made and no lawful nomination has been made, may as a Democrat lawfully contest for an elective office in the general election, can not be denied. It being his lawful right to contest for the office as a Democrat in the general election, where no nomination is required to be made and no legal nomination has been made, the candidacy of such a member of the party in the general election is, in our opinion, as clearly protected by article 3173 against a nomination by the executive committee, declared as unlawful by that article, as would be the candidacy of a member of the party for a nomination in the general primary election. To hold otherwise is simply to narrow the scope and purpose of article 3173 to the protection of only candidates for a party nomination or the lawful nominees of a party. In view of its broad provisions the statute can not in our opinion be so limited It declares that, except as provided in article 3172, "no executive committee shall *ever* have any power of nomination." This can only mean that the power denied is forbidden at all times and under all conditions. It necessarily follows that the statute protects not only candidates for a party nomination and the duly declared nominees of a party, but, as well, the candidacy in the general election of a member of the party as such, where no nomination is provided for and no lawful nomination has been made, and confers upon such a member the legal right to invoke its protection by an appropriate proceeding in the courts. Any other view, it seems to us, simply means that an executive committee may in the face of a plain statute make an unlawful nomination, and that a member of the party, rightfully a candidate for the office because of no nomination having been made, and the rest of the party membership, as well, are powerless to resist the committee's action but must

submit to it. This, in our opinion, would result in the nullification of the statute.

We think it also plain that the proposed action of the committee threatens a material injury to the plaintiff for the redress of which no adequate legal remedy exists, entitling him to equitable relief. This was the holding of a majority of the honorable Court of Civil Appeals, constituted by ·Chief Justice Conner and Associate Justice Buck, if article 3173 prohibited a nomination by the committee. We think that holding was correct. It is shown that the nomination of Mr. Hurdleston by the committee will be equivalent to his election. It would destroy all prospect of the plaintiff's election and, under the agreed statement of facts, will wholly preclude his candidacy. If, in virtue of article 3173 it is his legal right to be protected in his candidacy against an unlawful nomination by the committee, as we have held, the destruction of that right and, in consequence, all prospect of the plaintiff's election, necessarily will inflict upon him a substantial injury. It is apparent that no legal remedy is available to prevent the legal right of the plaintiff to have his candidacy unopposed by an unlawful nomination being in effect destroyed, or to avoid the destruction of all prospect of his election, which, it is agreed, will be the result if the committee is permitted to make the proposed nomination. The first maxim of equity is that it will not suffer a right to be without a remedy.

We do not believe there is any appreciable conflict in the authorities upon the proposition that where the making of party nominations by political parties is once regulated by the statute law the rights created and protected by a statute are legal, as distinguished from political, rights; and that for their invasion equity will afford its relief where there is no adequate legal remedy. Cases exist wherein it is asserted that the rights of members of political parties in respect to party nominations are mere political rights of which the courts will not take· cognizance, but in most instances it will be found that this doctrine has been asserted where there was no statutory regulation of such nominations. McDonald v. Lyon, 43 Texas Civ. App., 95, 95 S. W., 67, decided by the honorable Court of Civil Appeals for the Fifth District, illustrates cases of this character. It involved a mere party dispute, ungoverned by any law save the party law. The rights involved were, therefore, purely political and without any legal standing. It was properly held that the courts would not interfere for the settlement of such a dispute.

An essentially different status, however, is presented where the making of party nominations is governed by law. Rights arising under such laws, as is true in respect to all rights conferred by statute, are held to be legal rights, the exercise of which the courts will protect as a part of their duty to give effect to the written law of the land. And for the enforcement of such rights equity will not in proper cases deny its relief.

Eagan v. Gerwe, 112 Ky., 232, 65 S. W., 437, decided by the Court

of Appeals of Kentucky, the court of last resort in that State, presented a case where the executive committee of a political party attempted to fix a certain 'date as the last day on which any person would be permitted to submit his name to be voted for at a certain primary election of the party which had been duly called to nominate candidates of the party. The time within which such names were to be submitted was governed by a statute which fixed the last day for that purpose later than that fixed by the committee. The plaintiff in the case, a member of the party, submitted his name to the committee to be placed upon the primary election ballot as a candidate for the party nomination as a candidate for State Senator, within the period fixed by the statute, and his request was refused by the committee. He was granted a mandatory injunction to compel the placing of his name on the ballot. The Court of Appeals held that he was entitled to such relief.

In Brown v. Committee, 119 Ky., 720, 68 S. W., 622, decided by the same court, the executive committee of a party was proceeding to hold a primary election under rules and regulations essentially different from the requirements of the Kentucky statute governing such an election. It was held that a candidate in the election was entitled to an injunction to restrain the committee from holding the election in any manner violative of the statute.

Neal v. Young, 75 S. W., 1082, by the same court, involved a case where certain candidates for nomination in a primary election sought to restrain a Democratic executive committee from declaring that the primary election, theretofore duly called, should not be held. In the opinion this is said:

"It was urged in argument that the question here involved is purely a political one, and that the courts should not take jurisdiction of it. My answer is that the Court of Appeals has a contrary opinion, and in Eagan v. Gerwe, Brown v. Republican County Committee, and Young v. Beckham, [115 Ky., 246, 72 S. W., 1092, 1094] has held that it had jurisdiction to enforce individual and legal rights. If it were a controversy between the old committee and the members claiming to be, under the appointment of the chairman, as to which was the regular committee, and no other rights were dependent upon the controversy, then it would be a purely political question, to settle which the courts would not take jurisdiction. When elections were conducted under the viva voce system, or by ballots furnished the electors by the candidates or their friends, no such question as is involved could arise. Since the adoption of the official ballot system by the constitutional convention, since the legislative branch of the State government provided for the regulation of primary elections by law, questions involving the legal rights of individuals will arise for the determination of the courts. The necessity for such adjudications has been placed upon the courts by the changes which have been made by the organic and statutory law of the State. However much the courts desired to

do so, they could not avoid the responsibility of deciding such questions, even if perchance someone should fail to discriminate between political rights and those legal rights which arise under the law, and declare the court was adjudicating purely political questions. The Democratic committee of Jefferson County and the City of Louisville, being officers in virtue of the primary election law, were entitled to conduct the primary election, and to ascertain and certify the result of it without any interference or hindrance of the defendants. To protect them in the exercise of this right, injunction was the proper remedy." 75 S. W., 1082.

Because the rights of the plaintiffs in these several cases arose under and were protected by a statute, the reason of these decisions is that they could no longer be regarded as purely political rights, but were essentially legal rights, for the protection of which against illegal action by the party authorities only equity afforded an adequate remedy, notwithstanding the management and methods of a political party were involved and the action of the party authorities thus subjected to review by the courts.

Brown v. Cole, 104 N. Y. Supp., 109, presented a case where a Republican elector sought to restrain by injunction a Republican county committee from carrying into execution a system of enrollment formulated by the committee by which all persons except those whose names might appear upon the enrollment were to be excluded from participation in the Republican primaries of the county. The statutes of the State prescribed the qualifications of the persons entitled to be enrolled for the purpose of voting in primary elections. The basis of the suit was the committee's disregard of such statutes. The same argument was made in the case as is made here against the right of the plaintiff to an injunction, namely, that his right to vote in the primary election was a mere political right, not cognizable in equity. The court disposed of the contention in these words:

"In the common law no place was found for the political rights of citizens. . . . The necessity for a different rule regarding the non-recognition of the political rights of citizens did not become apparent for many years after the formation of our government, and the ancient doctrine found expression in numerous decisions of our courts. The reasons therefor were not those which originated the doctrine, but were found in the fact that such rights were regarded as belonging to matters which did not concern the public at large, and from their very nature beyond the pale of the law. Political parties differ from individuals, corporations, and chartered organizations, in that they are not liable to amercement, incarceration, or dissolution, and, therefore, not subject to the familiar methods of governmental restraint. For many years statecraft was at a loss to discover any method by which they might be brought under effectual control. . . . The struggle to accomplish this result has left its marks upon the statute books of this State for the last fifty years, where the history of its progress may

be read by anyone desiring enlightenment upon the subject. . . . The objects of these provisions (the statutory provisions prescribing the duties of the officers of the primaries, the method of procedure, qualification of voters, etc.) are manifest, and it is not to be presumed that the Legislature would so attempt to regulate and prescribe, in respect to the holding of primaries and the qualifications of voters thereat, without intending to enable one having an interest in such primaries to protect and defend his rights and enforce compliance with the law. Otherwise the statute would be inane and an elector powerless. . . . Reference is here made to the enrollment laws for the purpose of indicating the completeness of the legislation of recent years touching the rights of electors, the regulation of political parties, and the duty and jurisdiction of courts to take cognizance thereof. *From this review of such legislation, I conclude that the old doctrine that political rights were beyond the domain of judicial investigation and determination has been swept away, and that there no longer remains any distinction between the civil and political rights of citizens, and that the courts may not shut their doors against the enforcement of any such rights. It will be presumed that every right, recognized or conferred by statute, may be protected, defended, and enforced by an appropriate legal method and that every wrong has its remedy.*"

To the same effect is Walling v. Lansdon, 15 Idaho, 282, 97 Pac., 396, where the general question is elaborately discussed.

In Cook v. Houser, 122 Wis., 534, 100 N. W., 964, in discussing this question, it is said:

"The time has long since passed for serious controversy as to whether in this class of cases judicial questions are involved. The idea urged upon our attention by defendant's counsel that they involve only political questions which should be left for solution to the party organizations directly interested, has been judicially denied over and over again. We venture to say that there is no conflict at this time in respect to the matter, in judicial authorities dealing with legislative plans for the use of an official ballot."

We have attempted to make a careful review of the authorities relied upon by the defendants in error in support of a contrary view. As given in their brief, they are as follows: Walls v. Brundige, 109 Ark., 250, 160 S. W., 230; Winnett v. Adams, 71 Neb., 817, 99 N. W., 681; in re Sawyer, 124 U. S., 200, 8 Sup. Ct., 482, 31 L. Ed., 432; Anthony v. Burrow, 129 Fed., 783; McDonald v. Lyon, 43 Texas Civ. App., 484, 95 S. W., 67; Robinson v. Wingate, 36 Texas Civ. App., 65, 80 S. W., 1067; S. C. 98 Texas, 267, 83 S. W., 182; City of Dallas v. Consolidated Street Railway Co., 105 Texas, 337, 148 S. W., 292; Harding v. Commissioners Court, 95 Texas, 175, 66 S. W., 44; Fletcher v. Tuttle, 151 Ill., 41, 25 L. R. A., 143, 42 Am. St., 220, 37 N. E., 683; Alderson v. Commissioners, 32 W. Va., 640, 5 L. R. A., 334, 25 Am. St., 840, 9 S. E., 868; Kearns v. Howley, 188 Pa. St., 116, 42 L. R. A., 235, 68

Am. St., 852, 41 Atl., 273; 15 Cyc., 331; Annapolis v. Gadd, 97 Md., 734, 57 Atl., 941; State v. Foster, 111 La., 939, 36 So., 32.

No one of these cases, with possibly one exception, is in any respect analogous to the present case, and none of them controls it. They group themselves into the following classes: (1) Those in which it does not appear that the particular right involved, for the enforcement of which the action was brought, was protected by any statute. (2) Those in which the suit was to restrain some step in an election, in nowise invading any right of the complainant. (3) Actions to prevent removal from office or to contest the title to an office. (4) Where the effort made was to obtain a review of some character of party action, when a special tribunal had been created by a statute for the settlement of such disputes and given finality of decision concerning them.

McDonald v. Lyon has already been noticed. In none of the other Texas cases cited were the questions presented here in anywise involved. In each it was claimed that a property right of the complainant would be invaded if the result of a particular election was permitted to be declared. The decisions but affirm the well established doctrine that the completion of an election or the mere declaration of its result does not impair or threaten any property right; and that the courts will not interfere to prevent the completion of elections, belonging as they do to the political branch of the government.

Fletcher v. Tuttle (Ill.) is relied upon as a leading authority. It holds that an action instituted to have an apportionment act declared unconstitutional presents merely a political question. This holding is directly opposed by the Supreme Courts of Indiana and Wisconsin, both of which announce that such a question is judicial. Parker v. State, 133 Ind., 178, 32 N. E., 836, 33 N. E., 119, 18 L. R. A., 567; State v. Cunningham, 81 Wis., 440, 15 L. R. A., 561, 51 N. W., 724.

In re Sawyer, 124 U. S., 200, 8 Sup. Ct., 482, 31 L. Ed., 402, grew out of an action in equity, brought in a Circuit Court of the United States, to restrain a city council of a city in a State from removing a police judge from office. It was held that the question of title to a public office is cognizable alone in courts of law, and that a Circuit Court of the United States was without authority to restrain the council of a city from trying and determining charges of malfeasance against a city official.

Winnett v. Adams (Neb.), was a case where the action was to restrain a party committee from putting into force a certain rule governing the official ballot of a primary election. It does not appear from the decision that the action of the committee was in fact prohibited by any statute. The court in its opinion adverts to no statute purporting to deny to the committee the authority it assumed to exercise. If there was no such statute, clearly no legal right was invaded.

In Kearns v. Howley the action was to restrain a chairman of a party committee from filling vacancies in the committee. It is distinctly stated in the opinion that the action sought to be enjoined was not pro-

hibited by any statute, and, of course, there was in such case no violation of any legal right of the complainant. This significant passage is found in the opinion:

"It may be, if this bill had aimed to prevent a threatened violation of law by any of these officers it could have been maintained."

When these cases are examined and the actual decision in each is considered, it will be found that the questions presented by this case were not at all involved, with possibly the exception of Walls v. Brundige (Ark.). It is unnecessary to review them further. Walls v. Brundige remains to be considered.

It concerned a contest for the Democratic nomination for Governor. By statute it was provided that the central committee of the party should constitute a board for the hearing of contests of primary elections with the right of appeal to the State convention; and that the decision of these tribunals should be conclusive of the contest. S. Brundige and Judge Hays were rival candidates for the nomination. Brundige filed a contest with the central committee. It heard the contest and determined that Judge Hays had received a majority of the votes, declaring him the nominee. The bill of complainant alleged that the committee had not granted him a hearing upon his contest, but had arbitrarily declared his opponent to be the nominee. It prayed that the certification of his nomination be enjoined. A majority of the court held that the rights of Mr. Brundige were merely political and not cognizable in equity. It is to be noted, however, that the decision of the case is in part rested upon the fact that a special tribunal had been created by statute for the hearing of such a contest and its determination; that its decision was made final by statute, and was, therefore, not subject to review in the courts. A dissenting opinion was filed by Chief Justice McCullough, holding that the allegations of fraud in respect to the action of the committee on the contest gave equity jurisdiction of the case, upon the ground that the right of the complainant to a fair hearing before the committee was a legal right because a statutory right; further holding, however, that since the complainant had permitted the time to elapse in which the contest could be determined in advance of the general election, he had no right which equity could protect,—clearly a proper disposition of the case.

In Chief Justice McCullough's opinion in this case, attention is directed to the fact that the cases which hold that no court will interfere in the matter of nominations because depending purely upon party regulations, all antedate the enactment of statutes providing for such regulation; and that where the field has been entered upon by Legislatures as a fit subject of regulation by law, the courts hold that legal rights are thereunder established which the courts will protect. His conclusion that the right conferred by the statute to a fair hearing of the contest before the committee was a legal right, which would be protected in equity against fraudulent action of a party committee, is, in our view, unassailable.

The holding of the majority of the Arkansas Supreme Court in Walls v. Brundige more nearly supports the contention of the defendants in error here than any case cited. But we are unwilling to give our concurrence to the doctrine that a right conferred by the statute law of the State is not a legal right. To hold that such rights are not legal rights in our judgment destroys the force of the statute law.

The case has been carefully considered. While the good faith of the State executive committee is not in our opinion to be doubted, we think it clear that its proposed action is prohibited by the statute and that the plaintiff was entitled to have it restrained.

The judgment of the Court of Civil Appeals is reversed and that of the District Court is affirmed.

(Associate Justice Yantis dissenting.)

### CONCURRING OPINION.

MR. JUSTICE HAWKINS delivered the following concurring opinion:

Very heartily I concur in the conclusion announced in the opinion by Chief Justice Phillips. Likewise I concur in nearly all that is there said so admirably. Except as to the effect of article 2966, Revised Statutes, no specific mention of which is made therein, said opinion is clear, direct, forcible, convincing, unanswerable; and, since that article is inoperative, as hereinafter indicated, the conclusion remains irresistible.

However, there are certain features of this case which I consider worthy of special mention in the following observations:

(1) As to the authority or right of the State executive committee to nominate:

Our original statute regulating primary elections, Acts, 1905, 1 S. S., page 520 et seq., contained the following provisions:

(a) "A nominee may decline and annul his nomination by delivering to the officer with whom the certificate of his nomination is filed . . . a declaration in writing, signed by him before some officer authorized to take acknowledgments. *Upon such declination (or in case of death of a nominee), the executive committee* or a majority of them for the State, district or county, as the office to be nominated may require, *may nominate a candidate to supply the vacancy.*" Sec. 50. That identical language now forms part of article 3172, Revised Statutes.

(b) "No executive committee shall ever have any power of nomination except where a nominee has died or declined the nomination as provided in section 50 of this Act." (Sec. 118.) That provision has been carried into article 3173, Revised Statutes, the sole change being the substitution of the words "in article 3172" for the reference to the original section 50.

Such is now the plain, terse, unambiguous, mandatory law controlling this case. Unequivocally and sternly it forbids, under existing circumstances, any nomination by any executive committee.

As a side-light, further disclosing the intention of the Legislature, it

is interesting to note that said original Act provided, in section 105, and article 3086. Revised Statutes, now declares:

"Nominations of candidates to be voted for at any *special election* shall be made at a primary election at such time as the party executive committee shall determine, *but no committee shall ever have the power to make such nominations.*"

Furthermore, section 118 of said original Act, and article 2966, Revised Statutes, now in force, alike provide:

"No name shall appear on the official ballot except that of a candidate who was *actually nominated in accordance with the provisions of this Act.*"

Certainly, then, beyond all room for argument or cavil, it was the purpose of the Legislature, as disclosed in the quoted language of section 50 (article 3172), and section 118 (article 3173), to make illegal, and to prevent, the making, by the committee, of the nomination here in question; and that was within the scope of legislative authority, that character and measure of regulation of party nominations being clearly reasonable.

(2)   As to the making of a nomination, under existing circumstances, by the party, otherwise than by direct action of its State executive committee:

Article 3173 is not the only provision in the nature of a limitation or restriction upon the exercise of the right to nominate. The above quoted provisions of article 2966 (original section 118), also, are applicable, and must be considered.

If taken and applied according to their literal meaning, as the Legislature evidently intended, and in connection with article 3173 and the fact that our statutes prescribe no method whatever for making a nomination under the circumstances here presented, the effect of said provisions of article 2966, if they be valid, and operate under the circumstances, is, primarily, to forbid the placing of any name upon the official ballot as that of a party nominee, even though such nomination be made by the party itself, in accordance with party usage and in some customary and regular way other than by direct action of the State executive committee, and, secondarily, to render a nomination, even when so regularly made by the party itself and not by its executive committee, practically nugatory; and the ultimate result is to deprive the party and its adherents of any and all benefits which might flow from the making of a party nomination under the circumstances which exist in this instance.

However, for these very reasons, said provisions of article 2966, in so far, at least, as they apply to such circumstances are, in my opinion, wholly invalid, as constituting an utterly unreasonable exercise by the Legislature of its conceded power to regulate and control party nominations.

The Legislature may regulate, but it is powerless to prevent, *in toto,* the making of a party nomination under the present circumstances.

Consequently, said provisions of article 2966 being to that extent inoperative, and our statutes prescribing no method for making a party nomination under the circumstances, and said provisions of article 3173 forbidding the executive committee to nominate in such instances being valid, the legal effect of our statutes, as a whole, is to leave intact the ancient right of the party to make a nomination in this instance, in such manner as the party, or its members, collectively, may adopt, save and except that its State executive committee may not nominate. Inasmuch as the former officer died five weeks prior to the general election, during which period the party itself might make a nomination for that office through primary conventions and a State convention, or otherwise, rather than by such direct action of the committee, article 3173 is not open to attack upon the ground that, in this instance, it closes the doors to the making of any party nomination.

(3) Our statutes, while not in terms conferring upon the applicant a right to make the race in question without the handicap of an illegal nomination against him, clearly recognize the existence of that right, which is thereby transformed from an erstwhile purely political right into a present legal right, the protection of which is, therefore, and thenceforth, appropriately and imperatively a subject of judicial cognizance, in a proper action, as completely as is any property right.

(4) Our statute on injunction provides:

"Judges of the District and County Courts shall, either in term time or vacation, hear and determine all applications and grant writs of injunctions returnable to said courts in the following cases:

"1. *Where it shall appear that the party applying for such writ is entitled to the relief demanded, and such relief or any part thereof requires the restraint of some act prejudicial to the applicant.*

"2. Where, pending litigation, it shall be made to appear that a party doing some act respecting the subject of litigation, or threatens or is about to do some act or is procuring or suffering the same to be done in violation of the rights of the applicant, which act would tend to render judgment ineffectual.

"3. In all cases where the applicant for such writ may show himself entitled thereto under the principles of equity, and as provided by statutes in all other Acts of this State, providing for the granting of injunctions, or where a cloud would be put on the title of real estate being sold under an execution against a person, partnership or corporation, having no interest in such real estate subject to execution at the time of the sale, or irreparable injury to real estate or personal property is threatened, irrespective of any legal remedy at law." Art. 4643, Rev. Stats.

The quoted provisions appear to have been injected by the codifiers into the revision of 1879. Like the English statute of 1873, they have enlarged, very greatly, the scope and sweep of equity jurisdiction, extending it far beyond its former confines. Summer v. Crawford, 91 Texas, 129, 41 S. W., 994; Ex parte Warfield, 40 Texas Cr., 413, 76

Am. St., 724, 50 S. W., 993; Ex parte Allison, 48 Tex. Cr., 634, 3 L. R. A. (N. S.), 622, 13 Ann. Cases, 624, 90 S. W., 492; Dibrell v. City of Coleman, 172 S. W., 553.

Obviously the first subdivision was intended to do more than to protect property rights, with which the third subdivision deals. In my opinion subdivision 1 plainly authorizes, and the facts of this case unquestionably require, the restraint, by writ of injunction, of said proposed action by the State executive committee, such action being both clearly illegal and highly prejudicial to said legal right of the applicant to run, as a Democrat, for the office in question, without being hampered by an illegal nomination against him. It may be, and I am inclined to believe that, irrespective of his own candidacy, and, merely in his own capacity as a member of that party, applicant is entitled to the injunction sought; but that point need not be decided now.

### DISSENTING OPINION.

Mr. Justice YANTIS delivered the following dissenting opinion:

I do not agree with the views expressed in the majority opinion in this case, and I feel impelled by a sense of duty to dissent therefrom, and to record my views.

The confusion of opinion among attorneys and courts in this case upon one of the questions involved grows out of the construction of article 3173, Vernon's Sayles' Civil Statutes, which is a part of the very voluminous Act of 1905, regulating primary elections of political parties. According to my view, there should be no difficulty, and no disagreement, if we should apply the rules of construction provided by standard text-writers, and announced by the various Supreme Courts of the United States. My first impression was that the courts would not be permitted or authorized to give the section of the statute referred to any construction different from the literal meaning of the words employed in that section. But upon investigation of the authorities I find the rule to be uniform among the courts and text-writers to the effect that where a section of a statute, in the meaning of the literal words employed, is in conflict with the general intent and purport of the entire Act, the language of such section which is in conflict with the general intent and purport of the entire statute will be so reformed as to make it harmonious with such intent of the Legislature; that other words may be added to such section, or words may be taken therefrom to make the section harmonious in meaning with the intent and purport of the general Act. I think when that rule of construction is followed in this case, article 3173 would not be rendered void, but would be binding and enforceable as so reformed; and that when so reformed to conform to the intent and purport of the general primary election law, as shown by its context, its provisions would not be prohibitory of the power of the State Democratic executive committee to make nominations in cases of sudden emergency where it is impossible or

impracticable for the nomination to be made by primary election, under the provisions of the primary election law.

Rightly construed, it is plain from the meaning of the words employed in the general primary election law, and from the context thereof, that the Legislature intended to accomplish at least four reforms: (1) It intended to prohibit the nomination of candidates by the precinct convention system which had been employed prior to its enactment, and to adopt in lieu thereof a plan which would allow every voter in the party to vote directly in primary elections his choice for a candidate, and that the majority or plurality candidate, according as fixed by its provisions, should be the nominee of the party for the office for which he was a candidate, entirely independent from the will of conventions or executive committees; (2) that said primary election law was not intended to be applied to instances of sudden emergency arising too near the general election to render practicable, for want of sufficient time, for the will of the party to be ascertained in time for the name of the nominee to be printed on the official ballot for the general election; (3) that there was no intention to prohibit a political party from making a nomination in a case of sudden emergency, such as is presented in this case, where the emergency arose too late for the primary election to be held; (4) that the intention of the Legislature is clearly indicated, to the effect that in cases of sudden emergency happening too late for primary elections to be held, that the State executive committee of each party would not be prohibited from making a nomination for the party whose interest and welfare had been entrusted to its keeping. The Act specifically provides for the State executive committee of the parties to make such nomination in cases of sudden emergency arising from the death of a nominee or from the resignation of the nominee. Can it be believed that the Legislature intended to prohibit the executive committee of the party from making nominations in instances of other emergencies of a similar kind? What reason could exist for the Legislature to intend to authorize the executive committee of political parties to make nominations in cases where the nominee resigned, or where he died, but to forbid the executive committee from making a nomination in the same kind and character of emergency such as arises upon the death of an officer who was not the nominee of the party? This would be to prohibit one party from having a nominee for the office vacated by the death of the occupant, and to thus force the party into unfair competition with the other political parties by refusing to allow its members to concentrate upon one candidate, thereby compelling it to hazard its chances in the election by several candidates of the same political persuasion running in the election, and perhaps against only one candidate of parties of opposite political persuasion. It is plain from the entire Act that no such advantage was intended to be given to any political party; that no such disadvantage should be visited by law upon any political party, for if there is one thing plainly shown in the entire

Act, it is that each political party should have the same fair opportunity by the law to concentrate the power of such party in favor of one certain candidate of its own faith. The plain intent of article 3173 is to enforce the other provision of the primary election law which gives the public the right to nominate directly by primary vote, and to forbid executive committees of political parties from thwarting the will of the people in this particular, and from usurping their right to elect by primary election, by themselves making nominations for the party. The intention is very plain, to prohibit nominations in any other way except by primary election, *except in cases of sudden emergencies arising too late for the primary election to be held.*

Article 3173 meant only to prohibit executive committees from usurping the right of the people to elect in primary elections, except that it did not intend, any more than the general primary election law intended, to prohibit the executive committee from making nominations in cases of sudden emergencies arising too late for the primary election to be held. The insertion of any two or three words appropriately used in article 3173 would conform it to the general plan and intention of the primary election law on the points involved. Article 3173, referred to, is as follows:

"No executive committee shall ever have any power of nomination, except where a nominee has died or declined the nomination as provided in article 3172."

. Now, suppose this article of the law should be reformed so as to make it prohibitive only of the power of executive committees to make nominations, except in cases of sudden emergency arising too near the election for the primary election to be held. This would give it the plain intent of the Legislature, and would make it harmonize with the other provisions of the Act. Clearly, as judged from the words employed in the entire Act, and their context, the Legislature did not have in mind, and did not intend to legislate at all on the subject of the right and power of the executive committee to make nominations to fill vacancies caused by the death of officers who were not nominees. This being true, and giving this effect to article 3173, would leave no law upon the subject, and, therefore, would leave the executive committee with full, unabridged power to act in such instances as the trustees of the party which they represented, and to make a nomination, or not to do so, according to their own best judgment and discretion. If effect should be given to the literal words of article 3173, this general intention of the Legislature could not prevail, but would be stricken down. Giving the literal meaning of the words employed in said article full effect leaves it in glaring conflict with the whole plain scheme and intention of the entire Act, and in such a case the rule of statutory construction is that the court should reform article 3173, either by adding to it, or by striking from it such words as would make it harmonize with the general intent of the Legislature.

There are some words that might be omitted from it which would

leave it in harmony with the intent of the Legislature as arrived at from the words employed, their context and plain meaning. As illustrative of the thought, suppose there should be inserted certain words so as that the article would read as follows:

"No executive committee shall ever have any power of nomination *where nominations are authorized herein* except where a nominee has died or declined the nomination, as provided in article 3172, but shall have such power where a nominee has died or declined the nomination, as provided in article 3172."

This would harmonize article 3173 so as to preserve the intent of the general Act to prohibit executive committees from making nominations provided for by primary elections, and from usurping the power of the people in that way. It would confer full power on the committee to make nominations where the nominee either died or resigned, and it would leave the committee uncontrolled as to what action to take if a vacancy occurred by the death of an officer not a nominee and too late to hold a primary election. The language inserted as indicated above is, of course, purely illustrative, and any other language taken from the section, or added to it, would do as well, or, perhaps, better, if it merely conformed the article to the general scheme, plan and intent of the entire Act.

This is but the common rule advanced by able text-writers, and as employed by the courts of the country generally, in giving effect to the legislative intent, by harmonizing the language thereto and therewith. Perhaps there is no better treatise on statutory construction than the very able text-book of Mr. Sutherland on that subject. The rule for which I contend is upheld in the strongest terms by this very clear, conservative and forceful treatise, in which he cites numerous authorities from everywhere to sustain the position. Sections 260-261 speak as follows:

"Mistakes may be corrected by aid of the context. Legislative enactments are not any more than any other writings to be defeated on account of mistakes, errors or omissions, provided the intention of the Legislature can be collected from the whole statute; and the title and preamble may be referred to for this purpose. Where a law possessing all of the requisites of a valid statute is passed, containing clear requirements capable of being carried into effect, in connection with other statutes on the same subject, a mistaken reference to them will not defeat the will of the Legislature and render it void. Thus, where an Act purporting to be an amendment of another Act describes it truly except that it incorrectly states the date, the erroneous statement will be treated as surplusage or corrected by construction. So references to other sections or statutes incorrectly made will be corrected where the context or other particulars identifies the statute or provision intended and enables the court to follow the reference with certainty. Where one word has been erroneously used for another, or a word omitted, and the context affords the means of correction, the proper

word will be deemed substituted or supplied. This is but making the strict letter of the statute yield to the obvious intent. So words which are meaningless or inconsistent with the intention otherwise plainly expressed in an Act have sometimes been rejected as redundant or surplusage. If a condition or qualifying clause has been misplaced so that in the connection where it is inserted it is absurd or nonsensical, the court will apply it to its proper subject and give it effect if the statute affords the proper clues, and it can be done in furtherance of its obvious intent. But where the language read in the order of clauses as passed presents no ambiguity, courts will not attempt to qualify it by any transposition of clauses and from what it can be ingeniously argued was a general intent. *Where the provisions of a law are inconsistent and contradictory to each other, or the liberal construction of a single section would conflict with every other following or preceding it, and the entire scope and manifest intent of the Act, it is certainly the duty of the courts, if it be possible, to harmonize the various provisions with each other; and to effect this it may be necessary, and is admissible, to depart from the literal construction of one or more sections.*

"*To enable the court to insert in a statute omitted words or read it in different words from those found in it, the intent thus to have read it must be plainly deducible from other parts of the statute.*" (Italics mine.)

In section 262 of said treatise, Mr. Sutherland says:

"Not only are words and provisions modified to harmonize with the leading and controlling purpose or intention of an Act, but also by comparison of one subordinate part with another; that is to say, the sense of particular words or phrases may be greatly influenced by the context, or the association with other words and clauses."

Again, in section 279 of Sutherland on Statutory Construction, it is said:

"In cases coming within the reach of the principle just illustrated, general words are read not according to their natural and usual sense, but are restricted to persons and things of the same kind or genus as those just enumerated; they are construed according to the more explicit context. This rule can be used only as an aid in ascertaining the legislative intent, and not for the purpose of controlling the intention or of confining the operation of a statute within narrower limits than was intended by the law-maker. It affords a mere suggestion to the judicial mind that where it clearly appears that the law-maker was thinking of a particular class of persons or objects, his words of more general description may not have been intended to embrace any other than those within the class. The suggestion is one of common sense."

In section 219 it is said:

"Not only may the meaning of words be restricted by the subject matter of an Act or to avoid repugnance with other parts, but for like reasons they may be expanded. The application of the words of a single provision may be enlarged or restrained to bring the operation

of the Act within the intention of the Legislature, when violence will not be done by such interpretation to the language of the statute. The propriety and necessity of thus construing words are most obvious and imperative when the purpose is to harmonize one part of an Act with another in accord with its general intent. The statute itself furnishes the best means of its own exposition; and if the intent of the Act can be clearly ascertained from a reading of its provisions, and all its parts may be brought into harmony therewith, that intent will prevail without resorting to other aids for construction. *The intention of an Act will pravail over the literal sense of its terms.* (Italics mine.) So general words in one part may be controlled and restrained by particular words in another, taken as expressing the same intention with more precision. The true meaning of any clause or provision is that which best accords with the subject and general purpose of the Act and every other part."

Again he says in section 215:

"Therefore it is an elementary rule of construction that all parts of an Act relating to the same subject should be considered together, and not each by itself. By such a reading and consideration of a statute its object or general intent is sought for, and the consistent auxiliary effect of each individual part. Flexible language which may be used in a restricted or extensive sense will be construed to make it consistent with the purpose of the Act and the intended modes of its operation as indicated by such general intent, survey and comparison— *ex antecedentibus et consequentibus fit optima interpretatio.*"

Mr. Sutherland announces the same doctrine in section 218 of his said treatise, as follows:

"It is indispensable to a correct understanding of a statute to inquire first what is the subject of it, what object is intended to be accomplished by it. When the subject matter is once clearly ascertained and its general intent, a key is found to all its intricacies;—general words may be restrained to it, and those of narrower import may be expanded to embrace it to effectuate that intent. When the intention can be collected from the statute, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such intention."

In support of this text, among the authorities cited by Mr. Sutherland are the following: Greenhow v. James, 80 Virginia, 636, 56 Am. Rep., 603; Mongeon v. People, 55 New York, 613; Reiche v. Smythe, 13 Wall., 162, 20 L. Ed., 166; Silver v. Ladd, 7 Wall., 219, 19 L. Ed., 138; Orange, etc., R. R. Co. v. Alexandria, 17 Gratt., 176; State v. Clark, 5 Dutcher (29 N. J. L.), 96; Commonwealth v. Loring, 8 Pick., 370; Murray v. Gibson, 15 How. (U. S.), 421; Butts v. Vicksburg, etc., R. R. Co., 63 Miss., 462; 2 Daniel on Neg. Instruments, sec. 1684; Kimbro v. Bank of Fulton, 49 Ga., 419; United States v. Kirby, 7 Wall., 482, 19 L. Ed., 278.

In the Eureka case Mr. Justice Field said:

*"Instances without number exist where the meaning of words in a statute has been enlarged or restricted and qualified to carry out the*

*intention of the Legislature. The inquiry, where any uncertainty exists, always is as to what the Legislature intended, and when that is ascertained it controls."* 4 Sawyer, 302, 317. (Italics mine.)

In the case of Robinson v. Varnell, 16 Texas, 382, Mr. Justice Wheeler, of the Texas Supreme Court, refused to give a statute a strict literal interpretation where the meaning of the literal words employed was in conflict with the object of the statute:

"We have seen that the expression in the statute, 'actions of debt,' can not receive a strict literal interpretation, without defeating the provision altogether; for we have no actions which come strictly and technically within that denomination. It must, then, receive such a reasonable and liberal interpretation as will give it effect according to the spirit and intention of the statute. To do this, we must disregard the technical distinctions of forms and terms, and look to the substance and manifest objects of the statute."

In the case of McLelland v. Shaw, 15 Texas, 319, the Supreme Court of this State, speaking through Mr. Justice Wheeler, modified and reformed the language used in a statute so as to harmonize with its object and intention. It said:

"Neither was the court, nor the auditor and Comptroller, required to place a construction upon the Act of the Legislature, which would lead to a consequence so repugnant to the common-sense understanding of the provisions of the Act, and so derogatory to the wisdom and sense of justice of the Legislature. They were required to look, not only to the words of the Act, but to the notorious facts which led to its enactment; so to construe its provisions, in reference to those facts, as to carry out and give effect to its well known meaning and intention, in the just and true spirit of the enactment. *Because by reason of the generality of the language, its most obvious merely literal construction might be different from its known object and intention* (italics mine), they were not, therefore, to disregard these and adhere to a merely literal construction, which would do violence to the manifest design and object of the provision. They were not required to ignore the well known historic facts to which the Act itself makes express reference. But the language and provisions of the Act are sufficiently suggestive of its true meaning and intention, to place that question beyond a doubt."

In the case of Edwards v. Morton, 92 Texas, 152, 46 S. W., 792, this court, speaking through Mr. Justice Brown, refused to follow the literal meaning of the words employed in the appeal bond statute (Revised Statutes, article 1673) and practically wrote almost an entire sentence into the statute in order to require it to yield to the legislative intent. He did not reform the statute, because to give to it the literal meaning of its words, "involved either an absurdity or a manifest injustice," as contended·in the majority opinion, but purely on the ground stated by him, that "courts will not follow the letter of the statute when it leads away from the true *intent and purpose* of the Legislature, and to conclusions inconsistent with the *general purpose* of the Act."

That is the identical proposition for which I contend. Article 3173, Vernon's Sayles' Civil Statutes, should be reformed so as to speak the intent and general purpose of the entire Act. Discussing the question, Mr. Justice Brown spoke as follows:

"The intention of the Legislature in enacting a law is the law itself, and must be enforced when ascertained, although it may not be consistent with the strict letter of the statute. Courts will not follow the letter of the statute when it leads away from the true intent and purpose of the Legislature and to conclusions inconsistent with the general purpose of the Act. Judge Moore properly characterized that kind of construction which disregards the intention and adheres to the letter of an Act in the following language: 'If the courts were in all cases to be controlled in their construction of statutes by the mere literal meaning of the words in which they are couched, it might well be admitted that appellants' objection to the evidence was well taken. But such is not the case. To be thus controlled, as has often been said, would be for the courts in a blind effort to refrain from an interference with legislative authority by their failure to apply well established rules of construction to, in fact, abrogate their own power and usurp that of the Legislature, and cause the law to be held directly the contrary of that which the Legislature had in fact intended to enact. While it is for the Legislature to make the law, it is the duty of the courts to "try out the right intendment" of statutes upon which they are called to pass, and by their proper construction to ascertain and enforce them according to their true intent. For it is this intent which constitutes and is in fact the law, and not the mere verbiage used by inadvertence or otherwise by the Legislature to express its intent, and to follow which would pervert that intent.' "

I, therefore, do not think the State executive committee violated the law in making the nomination, but acted entirely within its plain purpose, meaning and intent. If article 3173 is not given this construction, as I think it should be, in order to give it effect, then it should be held to be utterly void as prohibitive of the only method for a party to make a nomination not already prohibited by the primary election Act; and as so ably said by the majority the Legislature has not the power to prohibit political parties from making nominations. In that view, the Act of the State executive committee was not illegal, and the rights contended for by Gilmore were not created by said article. But if I am wrong in this, and article 3173 should be given literal effect, and if it should be held that said committee violated the law, still the right contended for by the plaintiff in error, Gilmore, is only a political right, and a court of equity, to which he has appealed for relief by injunction, has no jurisdiction to grant relief, since courts of equity are only conversant with civil rights, as contradistinguished from political rights.

The effect of the opinion of the majority is to hold that a court of equity may be resorted to for the protection of purely political rights,

as contradistinguished from civil rights; that a chancery court is empowered and authorized to issue writs of injunction to restrain political wrongdoers from violating the political rights of others. No court in Texas has ever made such a holding until now. There is precedent in the courts of Texas for the opposite view. The question has often been before the courts of the country, and with almost unanimity they have spoken plainly upon the subject, and have said, with but few exceptions, that courts of equity will not issue writs of injunction to protect political rights. With unanimity, text-writers have declared that a court of equity will not undertake to protect political rights from injury. But a new view, altogether at variance with the great weight of authority, both in this country and in England, is expressed by the majority of this court, which holds that a court of equity will lend its assistance to right political wrongs; that it will take jurisdiction of political rights, and protect them from the acts of the wrongdoer.

The rule is familiar to all that a court of equity will not grant relief against the acts of a wrongdoer where the injured party has an adequate remedy at law, or unless he shows a threatened irreparable injury to his civil rights. The statement of this proposition itself excludes granting relief to one who shows injury, or threatened injury to only his political rights. There is no use for a confusion of terms about it, because the term "civil rights" has a well defined meaning in the current law of the land, and does not include political rights. The plaintiff in error, Gilmore, presents no question affecting his property right, or any other civil right, but comes here alone upon the naked question that his political rights are threatened to be injured by the alleged wrongdoing of the State Democratic executive committee, if it should be permitted to nominate C. H. Hurdleston for the office of Railroad Commissioner, for which place the plaintiff in error, C. E. Gilmore, has announced as a candidate before the people of Texas in the general election to be held November 7, 1916. He does not ask to be afforded any relief in a court of law, but confines his petition and his prayer to a request for relief from a court of equity. We are not permitted, therefore, to go beyond his prayer in this suit and grant him a remedy at law, if it should appear that on proper pleading he would be entitled to have his alleged wrongs redressed in a court of law.

Are his so-called rights, civil rights, or are they political rights? He is making a political race, for a political office, and the right which he claims is his, is to make this political race unhampered by the political action of the State Democratic executive committee in making a nomination for the position which he claims in violation of a section of the primary election law, which regulates the conduct of political parties. The bare statement of his case establishes beyond controversy that the right which he contends has been, or will be injured, if the committee is not restrained, is a political right. But if it is not in this way made plain that his right is a purely political one, then it can be demonstrated

by testing whether it is a civil right, which rights have a well defined meaning, and if it is not, it must be a political right. Bouvier, volume 3, page 2961, defines poltical and civil rights as follows:

"*Political rights* consist in the power to participate, directly or indirectly, in the establishment or management of government. These political rights are fixed by the Constitution. Every citizen has the right of voting for public officers, and of being elected; these are the political rights which the humblest citizen possesses.

"*Civil rights* are those which have no relation to the establishment, support, or management of the government. These consist in the power of acquiring and enjoying property, of exercising the paternal and marital powers, and the like."

This definition has been approved by the courts of the country. Plaintiff in error, Gilmore, attempts to bring himself within this rule in the allegation in his bill that the office of Railroad Commissioner pays a salary of $4,000 per year, which makes the office property, and a property right is, of course, a civil right. But he fails to show that he owns the office, or is entitled to the salary. He only shows that he has a chance to secure it in the election, if the committee should be restrained from nominating another person. But he fails to show, as, indeed, I presume it is beyond his power to show, that even should the executive committee not make a nomination, he would then secure the office, for the reason that some other candidate might still defeat him. So, instead of owning the salary of the office, he only has at best, should the committee be restrained from making a nomination, a *chance* to secure the office, which is far different from owning property in the office, or in its salary. In other words, he does not own the office or its salary, but he has only a remote, speculative chance of acquiring it. I know of no case where the courts have granted the equitable relief of injunction, to protect from injury a bare chance to acquire property rights, which is as near the ownership of property rights as the plaintiff in error approaches in his bill for relief.

The primary election law of 1905, one provision of which the plaintiff in error contends is about to be violated by the State Democratic executive committee, undertakes to regulate by the exercise of the State's police powers the conduct of elections by political parties. It provides in very many instances that certain acts may be done, and in very many instances prohibits the doing of certain acts. It provides at least two methods for its enforcement, one by criminal prosecution, the other by mandamus (article 3143); but it will be noted that it fails to provide that the remedy of injunction may ever be resorted to. The mention of these two remedies should be held to exclude all other remedies not provided for by the act. At the time of its passage the statutes authorizing the courts to grant writs of injunction had application only to the protection of civil rights. They could not have been intended to cover rights arising out of the primary election law of 1905, for they had been in force more than twenty-five years when the primary

law was passed. This primary election law did not undertake to extend the equitable right of injunction to its own provisions, but instead, it provided other remedies and methods of enforcement. To that end it denounces every breach of its provisions, including article 3173, as a criminal offense, punishable by fine or imprisonment, or both, and in some instances denounces them as felonies.

Article 3173, referred to, does not create any rights, nor pretend to do so, in Gilmore's favor. That article, if in effect in its literal meaning, is prohibitory of the right of the State Democratic executive committee to make a nomination under the circumstances presented here. It is as follows:

"No executive committee shall ever have any power of nomination, except where a nominee has died or declined the nomination as provided in article 3172."

By its terms there is no pretense of creating any rights in the plaintiff in error, Gilmore, or in any other person, except that it creates a right in favor of the State to enforce the provision by a criminal prosecution. This was ample and adequate remedy for the State to enforce the law by its police powers, which is all that was ever intended by the Legislature, the Act, resting as it does, for constitutional right of existence, entirely upon the police power of the government.

The rule that a court of equity will not grant a writ of injunction to protect purely political rights has been so often decided that the writer has considered it a settled question. In the case of McDonald v. Lyon, 43 Texas Civ. App., 484, 93 S. W., 67, the question was definitely decided in accordance with that view by the Dallas Court of Civil Appeals, speaking through Mr. Justice Bookhout. In that case the suit was for an injunction by McDonald to restrain Lyon, who was the chairman of the State executive committee of the Republican party in Texas, from issuing his call as such chairman for the next State convention of said party to be held in El Paso, Texas, which the bill alleged Lyon was about to do in obedience to an order of the executive committee of said party. It was alleged, among other things, that the said State committee was vested with authority to select the place of meeting, but that the law provided that the meeting of the executive committee should be held on the second Monday in June, whereas, in that instance the executive committee which selected the place of meeting had been held in violation of law on the 8th day of May. There was also an allegation that the law provided that no one should act as chairman of such executive committee, or as a member of such committee who held an office of profit, or who was a candidate for an office of profit under the United States, and that said committee violated such provision of the law in that its members who participated in said meeting were all officers or candidates for office of profit under the United States, and that Lyon himself, who was chairman, was disqualified from acting in such position in that he was an officer of the United States, holding an office of profit at the time of said meeting.

The right of McDonald to have a court of equity grant a writ of injunction was held to be political even though such right was claimed to be derived from a State statute. Mr. Justice Bookhout, in refusing the injunction, addressing himself to the particular question of issuing injunctions to protect political rights, said:

"Again, there was no error in sustaining the demurrers to the petition and dismissing the cause, for the reason the petition seeks an injunction of rights which are merely political. A court of equity will not undertake to supervise the acts and management of a political party · for the protection of a purely political right. As was stated in Fletcher v. Tuttle, 151 Ill., 41, 37 N. E., 686, 25 L. R. A., 143, 42 Am. St. Rep., 220, quoting from Kerr on Injunctions: 'It is elementary law that the subject of the jurisdiction of a court of chancery is civil property. The court is conversant only with the question of property and the maintenance of civil rights. Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests. The court has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right of property. Nor do matters of political character come within the jurisdiction to interfere with the public duties of any department of government, except under special circumstances and where necessary for the protection of property rights.' A court of equity will not undertake to supervise the acts of the executive committee of the Republican party of Texas for the protection of a purely political right, such as that alleged in plaintiffs' petition. Winnett v. Adams, 71 Neb., 718, 99 N. W., 681; Fletcher v. Tuttle, 37 N. E., 683, 151 Ill., 41, 25 L. R. A., 143, 42 Am. St. Rep., 220; Alderson v. Commissioners, 32 W. Va., 640, 9 S. E., 868, 5 L. R. A., 334, 25 Am. St. Rep., 840; State v. Aloe, 152 Mo., 466, 54 S. W., 494, 47 L. R. A., 393; Green v. Mills, 69 Fed., 859, 16 C. C. A., 516, 30 L. R. A., 90; 5 Pom. Eq., 324, 331, 332. If these rights are interfered with the injured party must look to some other source than a court of equity for redress."

The case of Harding v. Commissioners Court of McLennan County, 95 Texas, 174, 66 S. W., 44, was a suit by Harding praying for a writ of injunction to enjoin the Commissioners Court of McLennan County from declaring the result of an election under the local option law in a part of the county. Judgment went against him in the trial court and he reached the Supreme Court by writ of error. He alleged in his petition that he was engaged in the sale of beer and other liquors within the limits of a prescribed local option precinct, but he failed to allege that he was *legally* so engaged. Chief Justice Gaines, speaking for the court, said:

"There is no averment that he was legally so engaged. If such were the fact it should have been alleged. Unless he was a licensed dealer, which is not averred and which we are not at liberty to assume, we are of opinion that he would have no such interest in the question agitated by his suit as would have entitled him to bring the action. Since it does not appear that the effect of declaring that the election had car-

ried in favor of local option was to imperil any pecuniary right of the applicant, *the question as to him is merely a political one, and the courts agree that a party can not sue to determine a controversy of such a character.*" (Italics mine.)

In the case of Winnett v. Adams, 71 Neb., 817, 99 N. W., 681, the Supreme Court of Nebraska, in denying a writ of injunction to protect a political right, said:

"The doctrine that equity is conversant only with matters of property and the maintenance of civil rights, and will not interpose for the protection of rights which are merely political, is supported by an almost unbroken line of authorities. . . . But we think it is perfectly safe to adopt the doctrine to the extent of holding that a court of equity will not undertake to supervise the acts and management of a political party for the protection of a purely political right. We do not overlook the fact that primary elections have become the subject of legislative regulation, and it may be conceded that each member of a political party has a right to a voice in such primaries, and to seek nominations for public office at the hands of his party. But when he is denied these rights, or unreasonably hampered in their exercise, he must look to some other source than a court of equity for redress. To hold otherwise would establish what could not but prove a most mischievous precedent, and would be a long step in the direction of making a court of equity a committee on credentials, and the final arbiter between contesting delegations in political conventions. The voters themselves are competent to deal with such matters without the guiding hand of the chancellor, and it will make for their independence, self-reliance, and ability for self-government to permit them to do so. It is true they may make mistakes, but courts themselves have been known to err."

Again, the Supreme Court of Nebraska, in the case of Phelps v. Piper, 48 Neb., 724, 33 L. R. A., 53, 67 N. W., 755, said:

"Political parties are voluntary associations for political purposes. They establish their own rules. They are governed by their own usages. Voters may form them, reorganize them, and dissolve them at their will. The voters ultimately must determine every such question. The voters constituting a party are, indeed, the only body who can finally determine between contending factions, or contending organizations. The question is one essentially political, and not judicial, in its character. It would be alike dangerous to the freedom of elections, the liberty of voters, and to the dignity and respect which should be entertained for judicial tribunals, for the court to undertake in any case to investigate either the government, usages, or doctrine of political parties, and to exclude from the official ballot the names of candidates placed in nomination by an organization which a portion, or, perhaps, a large majority, of the voters professing allegiance to the particular party believed to be the representatives of its political doctrines and its

party government. We doubt even whether the Legislature has the power to confer upon the court any such authority"

In the case of Green v. Mills, 69 Fed., 852, 16 C. C. A., 516, 30 L. R. A., 90, Mr. Justice Fuller said:

"The jurisprudence of the United States has always recognized the distinction between common law and equity as, under the Constitution, matter of substance as well as of form and procedure. And the distinction has been steadily maintained, although both jurisdictions are vested in the same courts. Fenn v. Holme, 21 How., 481, 484; Thompson v. Railroad Cos., 6 Wall., 134; Cates v. Allen, 149 U. S., 451, 13 Sup. Ct., 883, 977; Mississippi Mills v. Cohn, 150 U. S., 202, 205, 14 Sup. Ct., 75. It is well settled that a court of chancery is conversant only with matters of property and the maintenance of civil rights. The court has no jurisdiction in matters of a political nature, nor to interfere with the duties of any department of government, unless under special circumstances, and when necessary to the protection of rights of property, nor in matters merely criminal, or merely immoral, which do not affect any rights of property. In re Sawyer, 124 U. S., 200, 8 Sup. Ct., 482; Luther v. Borden, 7 How., 1; Mississippi v. Johnson, 4 Wall., 475; Georgia v. Stanton, 6 Wall., 50; Holmes v. Oldham, 1 Hughes, 76, Fed. Cas. No. 6643. Neither the legislative nor the executive department, said Chief Justice Chase, in Mississippi v. Johnson, 'can be restrained in its action by the judicial department, though the acts of both, when performed, are, in proper cases, subject to its cognizance.' 'The office and jurisdiction of a court of equity,' said Mr. Justice Gray, in In re Sawyer, 'unless enlarged by express statute, are limited to the protection of rights of property.' To assume jurisdiction to control the exercise of political powers, or to protect the purely political rights of individuals, would be to invade the domain of the other departments of government or of the courts of common law."

In the leading case of Fletcher v. Tuttle, 151 Ill., 41, 25 L. R. A., 143, 42 Am. St., 220, 37 N. E., 683, the Supreme Court of Illinois said:

"The question, then, is, whether the assertion and protection of political rights, as judicial power is apportioned in this State between courts of law and courts of chancery, are a proper matter of chancery jurisdiction. We would not be understood as holding that political rights are not a matter of judicial solicitude and protection, and that the appropriate judicial tribunal will not, in proper cases, give them prompt and efficient protection, but we think they do not come within the proper cognizance of courts of equity. . . . Other authorities of similar import might be referred to, but the foregoing are amply sufficient to show that, wherever the established distinctions between equitable and common law jurisdiction are observed, as they are in this State, courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political, and where no civil or property right is involved. In all such cases the remedy, if there

is one, must be sought in a court of law. The extraordinary jurisdiction of courts of chancery can not, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office; nor can it be invoked for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held. These matters involve in themselves no property rights, but pertain solely to the political administration of government. If a public officer, charged with political administration, has disobeyed or threatens to disobey the mandate of the law, whether in respect to calling or conducting an election, or otherwise, the party injured or threatened with injury in his political rights is not without remedy: But his remedy must be sought in a court of law, and not in a court of chancery."

In the case of Walls v. Brundidge, 109 Ark., 250, 160 S. W., 230, the Supreme Court of Arkansas, speaking directly to the political question involved here, said:

"It is well also to bear in mind that the right of a citizen to vote and to be voted for at an election, or to be a candidate for or to be elected to an office, is a political right in contradistinction of a civil or property right. Gladish v. Lovewell, 95 Ark., 621, 130 S. W., 579; Fletcher v. Tuttle, 151 Ill., 41, 37 N. E., 683, 25 L. R. A., 143, 10 Am. St. Rep., 220; In re Sawyer, 124 U. S., 200, 8 Sup. Ct., 482, 31 L. Ed., 402; Giles v. Harris, 189 U. S., 475, 23 Sup. Ct., 639, 47 L. Ed., 909; Green v. Mills, 69 Fed., 857, 16 C. C. A., 516, 30 L. R. A., 90; Winnett v. Adams, 71 Neb., 817, 99 N. W., 681."

Again in said case the Supreme Court of Arkansas stated its views as follows:

"It is contended, however, that appellee is given the right to contest the primary election held under the provisions of Act No. 371, page 342, of the Acts of 1911. It is true that Act does not provide for a contest of the primary elections, but it provides tribunals for the hearing of such contests; in the first instance, the Democratic central committee, with the right of an appeal therefrom to the State convention, and provides that the action of such tribunals shall be final. It is true that section 6 contains this provision: 'Provided, nothing in this Act shall be so construed as to prevent any person from pursuing any remedy he may have in any of the courts of this State.' This provision does not attempt to confer any right upon such contestant that he did not already have under the laws of this State before the passage of the Act; and, unless he had such right before its passage, none is given by it. It has been expressly held that the Legislature is absolutely without power under the provisions of our Constitution to give to the chancery court authority to hear election contests, and certainly the authority to hear such contests and adjudicate the rights of the parties can not be implied from this Act that expressly provides tribunals of the party

for the determination thereof, and declares that their determination shall be final.

It is suggested, however, that since the Legislature has legalized primary elections for the nomination of candidates to office, and provided a tribunal for contesting such nominations, a court of equity will protect them in the rights given by the statute, and that since an equitable remedy is asked, that the court may grant it, if it shall not extend to trying the contest and declaring the nominee. As already said, no equitable title or right is involved that can give jurisdiction to a court of equity, and, inasmuch as a political organization is an unincorporated, voluntary association, in which no rights of property or liberty are involved, a court of equity has no jurisdiction to interfere by injunction to control its action or those of its officers."

The rule is announced in Cyc. as follows:

"The subject-matter of equitable jurisdiction is civil property and the maintenance of civil rights. Injunctions do not issue to prevent acts merely because they are immoral or illegal or criminal, but only in case the complainant's civil rights are being invaded. So also rights that are purely political in their nature are not within the protection of the court of chancery. This has been made one ground for refusing injunctions in cases involving public office and elections." (22 Cyc., 757.)

The editor of the American & English Annotated Cases states the rule as follows:

"It seems to be the uncontroverted rule that a court of equity will not interfere to protect or enforce a purely political right. If a political right is infringed upon, the redress must be sought in a court of common law. Otherwise there would be an invasion of the domain of other departments of the government or of the courts of common law." (See note to U. S. Standard Voting Machine Co. v. Hobson, 10 Ann. Cas., 977.)

High on Injunctions affirms that a court of equity will not interfere by injunction to prevent political wrongs:

"No principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment or election, of public officers or their title to office, such questions being of a purely legal nature, and cognizable only by courts of law. A court of equity will not permit itself to be made the forum of determining the disputed questions of title to public offices, or for the trial of contested elections, but will, in all such cases, leave the claimant of the office to pursue the statutory remedy, if there be such, or the common law remedy by proceeding in the nature of a quo warranto." (High on Injunctions, sec. 1312.)

To the same effect is the holding of Kerr on Injunctions, whose text on the subject is as follows:

"It is elementary law that the subject of the jurisdiction of a court of chancery is civil property. The court is conversant only with the ques-

tions of property and the maintenance of civil rights. Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests. The court has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right of property. Nor do matters of political character come within the jurisdiction to interfere with the public duties of any department of government, except under special circumstances and where necessary for the protection of property rights."

To the same effect is the holding of Joyce on Injunctions: "It is not within the general powers of a court of equity to supervise the conduct of public officers in the performance of their official duties, or to prohibit such officers from acting, or to compel them to act, in matters which concern political and personal rights, as distinguished from rights of property and ministerial duties." (Sec. 1373.) (Also see sections 1386a, 1386b and 1386c, same author.)

In the case of United States Standard Voting Machine Co. et al. v. Hobson, 132 Iowa, 38, 7 L. R. A. (N. S.), 512, 119 Am. St., 539, 10 Ann. Cas., 972, decided by the Supreme Court of Iowa, the same view is expressed, that is, that a court of equity will not interfere to protect or enforce a purely political right. They said:

"The right to vote is a political and not a civil right, and a court of equity will not exercise its extraordinary power of injunction to protect a mere political right as distinct from a civil right. The plaintiff in the injunction case, as a taxpayer, could no doubt have relief by injunction to prevent the board of supervisors and the county auditor, defendants in that action, from attempting to carry out a contract which would impose an unlawful indebtedness upon the county; but as a taxpayer he had no interest in the question whether or not the November election in the county should be held by means of voting machines, and as a voter he had no interest in the method of conducting the election which would entitle him to control that method by the assistance of a court of equity. Some remedy at law he would, no doubt, have, if his right to vote were interfered with; but a court of law would not give him relief as against a mere anticipated wrong. It is to be noticed that the want of jurisdiction of the lower court to grant relief in equity was not on account of the want of right of the plaintiff in the injunction suit to maintain the action, but on account of the absence of any equitable right to relief on the part of anyone, and, therefore, the want of jurisdiction did not grow out of the incapacity of the particular plaintiff, but out of the incapacity of any plaintiff, to have such remedy. Therefore the question is not as to the capacity of the plaintiff to sue, but the power of the court to give the attempted relief. That courts of equity can not interfere by injunction to protect a claimed political right is too well settled to require extended discussion."

In the case of the State v. Aloe, 152 Mo., 466, 47 L. R. A., 393, 54 S. W., 494, the Supreme Court of Missouri said:

"The real and only purpose of the suit in the Circuit Court was to bar the entrance to the office of board of election commissioners by injunction, and to obtain a decree of a chancery court declaring relators' title to the office invalid. That is a subject over which a chancery court has no jurisdiction. The courts of law are open to all persons who have rights of that nature which have been violated, and ample means are afforded in those courts for the vindication of such rights and the redress of their wrongs. High, Inj., sec. 312; In re Sawyer, 124 U. S., 200, 8 Sup. Ct., 482, 31 L. Ed., 402; Hunter v. Chandler, 45 Mo., 452; State v. Vail, 53 Mo., 98; State v. May, 106 Mo., 488, 17 S. W., 660. . . . The powers of the chancery court are there plainly invoked to protect by injunction purely political rights. No such jurisdiction has ever been conceded to a chancery court, either in the Federal or State judiciary. The political rights of a citizen are as sacred as are his rights to personal liberty and property, but he must go into a court of law for them. A court of equity is a one-man power, wielding the strong force of injunction, often issued at chambers and on an ex parte hearing. Neither in England nor America has this power been suffered to extend to political affairs."

The case of Kearns v. Howley, 188 Pa., 116, 42 L. R. A., 235, 68 Am. St., 252, 47 Atl., 273, decided by the Supreme Court of Pennsylvania, was to the effect that a court of equity had no jurisdiction to restrain a chairman of a county committee of a political party from changing the names of duly elected members of the committee, or from filling vacancies on such committee with the names of persons not elected. Speaking through Mr. Justice Dean, the court said:

"The court below, we think, was misled into claiming for the courts of Pennsylvania enlarged chancery powers because of the tendency of our late legislation to regulate primary elections and prevent fraud and corruption by the election officers. It may be, if this bill had aimed to prevent a threatened violation of law by any of these officers, it could have been maintained. But there is no statutory injunction or prohibition directed to chairmen and secretaries of county committees. They are amenable alone to their party, which is purely political. The authority of the courts in such a case is thoroughly discussed by the New York Court of Appeals in McKane v. Adams, 123 N. Y., 609, [20 Am. St., 475], 25 N. E., 1057. In that case McKane filed a bill to enjoin the Democratic committee of Kings County from denying his membership. The court dismissed it, saying in the course of an elaborate opinion: 'His status, therefore, is that, though his own association elected him as a delegate to the general committee of the county organization, the members of that body have refused to admit him to associate with them in their office. And, if they would and will not associate with him, upon what reasoning and principle should they be compelled to, and the aid of a court of justice invoked? The right to be a member is not conferred by any statute, nor is it derivable as in the case of an incorporate body. It is by reason of the action and of

the assent of members of the voluntary association that one becomes associated with them in the common undertaking, and not by any outside agency, or by the individual's action. Membership is a privilege which may be accorded or withheld, and not a right which can be gained independently, and then enforced. So when, as by the plaintiff's own showing, the committee refused to admit him as a member, or to confirm his election, he was remediless against that refusal. No rights of property or of person were affected, and no rights of citizenship were infringed upon.' We adopt this language as expressing our opinion in this case, without referring to and citing the many cases to which counsel on both sides have called attention, for none of them is of such authority as to move us from our previous decisions. The Constitution and statutes of the commonwealth guarantee to all citizens the right of self-government, by protecting them in the exercise of the elective franchise for all officers voted for at State and local elections; and lately the law has gone further, and has so far recognized political parties as to pass an Act prescribing the duties of officers at primary elections, and imposing severe penalties for misconduct. But beyond this political parties and party government are unknown to the law. They must govern themselves by party law. The courts can not step in to compose party wrangles, or to settle factional strife. If they attempted it, it may well be doubted whether they would have much time for anything else. We reverse the decree, and direct that the bill be dismissed at costs of appellee." (41 Atl., 274.)

In the case of State ex rel. v. Dunbar, decided by the Supreme Court of Oregon, reported in 48 Ore., 109, 85 Pac., 337, the court said:

"The question involved in this appeal is purely a political one and affects no property or civil rights, and, as stated by Chief Justice Fuller in Green v. Mills, 69 Fed., 852 (16 C. C. A., 516, 30 L. R. A., 90), 'it is well settled that a court of chancery is conversant only with matters of property and the maintenance of civil rights. The court has no jurisdiction in matters of a political nature, nor to interfere with the duties of any department of government, unless under special circumstances and when necessary to the protection of the rights of property, nor in matters merely criminal, or merely immoral, which do not affect any right of property.'"

In the case of Sheridan v. Colvin, 78 Ill., 237, the Supreme Court of Illinois held that political questions are not within the jurisdiction of a court of chancery. They said:

"It is elementary law, that the subject of the jurisdiction of the court of chancery is civil property. The court is conversant only with questions of property and the maintenance of civil rights. Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests. The court has no jurisdiction in matters merely criminal, or merely immoral, which do not affect any right of property. Nor do matters of a political character come within the jurisdiction of the court of chancery. Nor has the court of chancery juris-

diction to interfere with the public duties of any department of the government, except under special circumstances and where necessary for the protection of rights of property."

In the case of Anthony v. Burrow, 129 Fed., 782, District Judge Pollock stated:

"The right to become the nominee of a political party for a public office, whether national or State, and as such nominee to receive the votes of the qualified electors voting to fill such office, is a purely political right as contradistinguished from a civil or property right."

He then quotes from the opinion by Mr. Justice Gray of the United States Supreme Court, in In re Sawyer, 124 U. S., 200, 31 L. Ed., 402, 8 Sup. Ct., 482, as follows:

"The office and the jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property.

"Political rights consist in the power to participate, directly or indirectly, in the establishment or management of the government. These political rights are fixed by the Constitution. Every citizen has the right to vote for public officers, and of being elected. These are the political rights which the humblest citizen possesses. Civil rights are those which have no relation to the establishment, support, or management of the government. They consist in the power of acquiring and enjoying property, or exercising the paternal and marital powers, and the like. It will be observed that everyone, unless deprived of them by sentence of civil death, is in the enjoyment of the civil rights, which is not the case with political rights, for an alien, for example, has no political, although in full enjoyment of the civil, rights."

In the case of Shoemaker v. Des Moines, 129 Iowa, 244, 3 L. R. A. (N. S.), 386, 105 N. W., 520, the Supreme Court of Iowa refused an injunction to protect political rights. The court said:

"To again recur thereto, it will be remembered that plaintiff claims no rights, except as a voter and a taxpayer. If, therefore, he is entitled to any relief at the hands of a court of equity, it must be because the threatened invasion of such matters of right, one or both, are properly cognizable in equity, and, this being established, that substantial grounds to apprehend irreparable injury have been made to appear. The contention of plaintiff predicated upon his capacity as a voter may be disposed of in a word. The right to vote at any election is a political right pure and simple; and equity does not interfere to protect or enforce political rights which are unconnected with any individual or property rights. Upon this all the authorities are agreed."

In the case of Dickey v. Reed, 78 Ill., 261, it was held that a court of chancery has no power to restrain by injunction a board of canvassers from canvassing the returns of an election, where the law under which the election was held neither in terms nor by implication confers such power. The Supreme Court in that case said:

"If the court may exercise this jurisdiction in cases of doubt, or even where there is no doubt, of the result, a few  .  .  .  persons might,

and probably would, be induced from the heat and strife always engendered in such elections, to resort to a bill and injunction, and thus for years thwart the will of the people. . . . Public policy does not require such a jurisdiction, even if it could sanction it. If the power were admitted, where would its jurisdiction end? . . . Sanction the power in this case as inherent in the court of chancery, could any ingenuity suggest reasons which should forbid the application of the same rule to every case we have above supposed, or any election case where fraud is alleged? In this case alleged fraud is the ground on which the power is urged. So would it be in those cases, and the fraud would be precisely the same in each."

Other Supreme Court decisions to the same substantial effect as are the authorities already quoted from are as follows: Hardesty v. Taft, 23 Md., 512, 87 Am. Dec., 584; People v. Rose, 21 Ill., 252, 71 N. E., 1124; Annapolis v. Gadd, 97 Md., 734, 57 Atl., 941; Weaver v. Toney, 107 Ky., 419, 50 L. R. A., 105, 54 S. W., 732; Parler v. Fogle, 78 S. C., 570, 159 S. E., 707; Ogborn v. Elmore, 121 Ga., 72, 48 S. E., 702; Vickery v. Wilson, 40 Colo., 490, 90 Pac., 1034; Giles v. Harris, 189 U. S., 475, 47 L. Ed., 909, 23 Sup. Ct., 639; People v. District Court, 18 Colo., 26, 31 Pac., 339; Shields v. Jacob, 88 Mich., 164, 13 L. R. A., 760, 50 N. W., 105; Stephenson v. Boards of Election Commissioners, 118 Mich., 396, 42 L. R. A., 214, 74 Am. St., 402, 76 N. W., 914; Potter v. Deuel, 149 Mich., 393, 112 N. W., 1071; Alderson v. Commissioners, 32 W. Va., 640, 5 L. R. A., 334, 25 Am. St., 840, 9 S. E., 868; McKane v. Adams, 123 N. Y., 609, 20 Am. St., 785, 25 N. E., 1057; State v. Foster, 111 La., 939, 36 So., 32; Muhler v. Hedekin, 119 Ind., 481, 20 N. E., 700; Taylor v. Kercheval, 82 Fed., 497; Peck v. Weddell, 17 Ohio St., 271, and Fleming v. Guthrie, 32 W. Va., 1, 3 L. R. A., 53, 25 Am. St., 792, 9 S. E., 23.

The courts of the country, as shown, have almost unanimously held that courts of equity have no jurisdiction over political questions, and can not grant relief to protect political rights. The effect of the majority opinion is to hold that courts of equity have jurisdiction over political questions, and may grant relief to protect political rights. This conclusion appears to be drawn from the premise that legal rights were conferred upon Gilmore as a candidate by article 3173, Vernon's Sayles' Civil Statutes, and from the maxim "For every wrong there is a remedy." That maxim is as old as the law itself, but it applies only to property rights, and to other civil rights, and not at all to political rights. It is within the knowledge and experience of every one conversant with the history of politics among a self-governing people, that for most political wrongs there is no remedy except in party conventions or at the ballot box. From time out of mind candidates for office and their friends have been treated with injustice, and with brazen wrong, but in very many instances the maxim "For every wrong there is a remedy" has not been a relief, and the reason is plain that the

maxim is impossible of enforcement without giving the courts juris-diction of all political questions.

But it is contended that Gilmore had the legal right to run unopposed by a Democratic nominee, and that article 3173 gave him that right, which made it a legal right, and that, therefore, it presents a judicial question, and not a political question. For the sake of argument, admit that said article granted to Gilmore a legal right, though I think in fact it did not, then how does it follow that since his legal right had been violated it was not a political question? All political questions present legal rights. The right of every citizen to vote and to be voted for presents a legal right,—it presents a constitutional right where a country, like this, is self-governed. It is the constitutional right of every citizen, from the highest to the lowest, to exercise his citizenship in a self-governed country by voting or being voted for, as he desires, but how could it be contended that because of such constitutional right, or because of Gilmore's alleged legal right, that it was not a political right because it was legal or constitutional? The statutes and the constitutions may and do confer purely legal rights upon citizens. But the quality of the right enjoyed does not derive its nature from its creator, but derives its nature from the kind and character of right conferred. It does not close the argument, or touch the issue, to say that the right conferred was a legal or was a judicial right, and, there-fore, was not a political right, since the Legislature and the Constitu-tion have full power to create political rights, and their action in so doing makes them legal rights, but does not change their political quality. To say that the right was a legal right, and to conclude that, therefore, it was cognizable in a court of equity, would mean to assert that every legal right is cognizable in a court of equity. My concep-tion is, that legal rights are cognizable in courts of law only, and that equitable rights are cognizable in courts of equity only. So that if Gilmore had legal rights he should have gone to a court of law for his remedy instead of into a court of equity. Every legal right violated presents a judicial question, whether it presents an equitable question or a law question. So that though the majority opinion may be con-vincing to everyone that Gilmore's right was a legal right, the question still remains, was it also an equitable right? If so, a court of equity would have jurisdiction to redress his wrong. If it was not an equit-able question, but only a legal question, his remedy is not to be had in a court of equity, but in a court of law. If it should be argued that a law court could furnish no remedy, on what basis could it be argued except upon the basis that in a law court he could not prove any damage for the alleged wrong in a suit against the committee? And why could he not? Not because there is no legal remedy in a court of law for the act done, but because he has no facts to show any-thing but a speculative interest in a chance to secure an office; and he would be unable to prove that he could secure it. This is not a failure of remedies, as that term is used, but a failure to make the necessary

proof to entitle him to the remedy in a court of law. Certainly if the members of the committee committed fraud against him, which is the substance of the allegation in Gilmore's bill, and if he suffered damage from such fraud, he could recover that damage in a court of law, and would not need a court of equity to protect him. Or if it be argued that the executive committee should have ordered a primary election, and failed to do so, then I would point to the article in the primary election statute referred to herein, giving him the power to mandamus the committee to order such election and to refrain from doing any act contrary to their duty in ordering a primary election. This remedy, if sought, would be sought in a court of law, and not in a court of equity. But because Gilmore is unable to present the quantum of proof necessary to establish his damage in a court of law does not entitle him to equitable relief in a chancery court. It is not provided in the rules of equity courts that in all instances where the injured party is unable to produce in a court of law sufficient evidence to prove his damage, he may bring his suit in a court of equity, and there have it maintained. Yet this seems to be the only basis for this alleged equitable suit.

It is contended in the majority opinion that only one of the leading cases cited by the defendants in error sustains the proposition that courts of equity will not take jurisdiction of political questions, for the reason it is stated that only one of said cases presented the breach of a right derived from a statute. It is specially stated that the case of McDonald v. Lyon, supra, decided by the Dallas Court of Civil Appeals, was not a case where the primary election law governed, and that it rested entirely upon the rules ordained by the Republican party, and did not rest upon a violation of a statute. With all due respect for this truly great opinion by the majority, I beg to call attention to the error in this statement. The case of McDonald v. Lyon, supra, was based exactly as this one is based, on a violation of the primary election law of 1905, as shown from the statement of the case, which shows that the suit was rested in part on a violation of the primary election law of 1905, and upon articles 2922 and 3137. The same error of statement by the majority relates to most all of the other cases cited and relied upon by the defendants in error, Waples et al., and especially is this true of the cases of Fletcher v. Tuttle, supra; Winnett v. Adams, supra, and Alderson v. Commissioners, supra, each of which plainly shows that the alleged equitable right was claimed to have been created by statute; and such will be found to be true on a careful reading of the great majority of the numerous cases cited by me in this minority opinion.

The cases quoted from by the majority opinion in opposition to the view herein contended for are the cases of Eagan v. Grewe, 112 Ky., 232, 65 S. W., 437; Brown v. Committee, 119 Ky., 720, 68 S. W., 662; Neal v. Young (Ky.), 75 S. W., 1082; Brown v. Cole, 104 N. Y. Sup., 109, and Walling v. Lansdon, 15 Idaho, 282, 97 Pac., 396. They

throw no light upon the question involved, unless a bare ruling adverse to the great weight of authority, without a discussion of the question involved, would be considered illuminating, for none of them pretend to discuss the question, and all of them ignore the great line of decisions to the contrary as if they had no existence. The case of Eagan v. Grewe, 112 Ky., 232, 65 S. W., 437, cited, relied upon, shows to have been at least in part a mandamus proceeding, which, of course, is not an equitable proceeding. The case of Brown v. Committee, 119 Ky., 720, 68 S. W., 622, cited, contains no discussion of the question, but a bare ruling. The case of Neal v. Young, 75 S. W., 1082 (Ky.), cited, was not by the Supreme Court of Kentucky, but the case was submitted to only one member of the court, presumably when the court was in vacation, and the opinion relied upon is his opinion, and not the opinion of the Supreme Court of .Kentucky. The case of Brown v. Cole, 104 N. Y. Sup., 109, cited, was not before the court of last resort, which is the Court of Appeals in the State of New York, as is well known, but was before what is denominated in that State a Supreme Court, which is a trial court similar to the District Courts in Texas, except that they are given some appellate jurisdiction. The case of Walling v. Lansdon, 15 Idaho, 282, 97 Pac., 396, cited, was not an injunction suit. It was an application for a writ of mandamus to compel the Secretary of State to certify the names of certain alleged nominees to the various election officers. Of course, this was but a legal proceeding, and·did not involve any equitable question; if the court expressed any view upon the jurisdiction of a court of chancery over political questions it was obiter dicta, and would not be an authority upon the question here presented. If the majority opinion should become the final opinion in this case when the motion for a rehearing is presented, if one should be, then the constitutional and statutory jurisdiction of the County, District and appellate courts, in my opinion, and with all due respect and deference to my brethren, will be so enlarged with political injunction suits, all of which would have priority over other litigation pending, that during a campaign year, in particular, it is, indeed, questionable whether any time at all would be left for the transaction of the other business in the courts. For the effect of this opinion, as I view it, is to clothe the courts with jurisdiction of all questions arising out of the violation of primary election laws, whether conferred directly or by implication. These statutes are numerous, and regulate most every conceivable act of parties participating in primary elections, from the precinct to the general State convention. All contesting delegations claiming to have been mistreated in violation of the law, instead of appealing to the State convention, as has been the custom, will then appeal to the courts, and all questions of irregularity which have in the past been settled by conventions, will be tried in the courts. There will be nothing left for the credentials committee to do. The disputes will be settled in court. All the frauds perpetrated in the State of Texas in an election will find their redress

in the courts instead of in the conventions, or in another election, as has been the custom in the past. If this were the law, then our duty would be to so hold, regardless of the disrespect thereby resulting for the courts in general; but if it is not the law that the courts should take jurisdiction of these questions, unless it has been plainly conferred upon them, which I believe it has not been, then the duty is at least equally plain to so hold. Convinced that the conclusion reached by the majority is erroneous, I have written, though hurriedly, at length, the reasons for my dissent. I thing the honorable Court of Civil Appeals at Fort Worth reached the correct conclusion in holding that the injunction proceedings should be dismissed.

*Judgment of Court of Civil Appeals reversed and judgment of District Court affirmed.*